# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>43.77 ACRES OF LAND MORE OR )<br>LESS IN THE COUNTY OF )<br>FRESNO; DONALD DEVINE, et al., )<br><br>Defendants. )<br>_____ ) | NO. Civ. F. 03-6065 AWI LJO<br><br>**ORDER RE: MOTION IN LIMINE TO EXCLUDE DEFENDANTS' PROPOSED USE OF RESIDENTIAL RECREATIONAL DEVELOPMENT** |

The Government has made five motions in limine; the Defendants have made three.  One of the Government's motions sought to exclude all evidence of Defendants' proposed highest and best use.  Oral argument on these motions were held on November 27, 2006.  Rulings were issued from the bench at that hearing.  This written order deals solely with Defendants' proposed highest and best use.

## I. History

Defendants are Donald Devine, David Wood, Double D Farms, and Harris Farms who own property in southwest Fresno County.  Plaintiff United States of America ("Government"), through eminent domain, took an easement over Defendants' properties in order to construct and operate a high-voltage 500kV electrical transmission line ("Path 15") running parallel and west of Interstate 5.  Path 15 has already been built and has been in operation since 2004.  Between

August 7, 2003 and August 12, 2003, the Government filed five declarations of taking for these properties.[1]  The direct takings and easements taken total about 252.06 acres.  Defendants dispute the Government's valuation of the takings and is seeking severance damages for the effect of Path 15 on their remaining holdings.

The pieces of property relevant to this order are Wood Ranch and Domengine Ranch (collectively the "Subject Properties").  Wood Ranch is a 2,448 acre cattle ranch comprising several parcels of land that, while disjointed, touch briefly at corners, catty-corner to each other.  Also sometimes included in the description of Wood Ranch is an additional 80 acre parcel a few miles to the south.  The 80 acre parcel will not be considered as part of this analysis.  The parcels that make up Wood Ranch are generally located within the triangle formed between Interstate 5, Highway 198 (Fresno-Coalinga Road), and Highway 145 (Dorris Avenue).  The property directly borders parts of these roads and has road access at various points to Highway 198 and Highway 145.  Domengine Ranch is a 12,530 acre cattle ranch located to the northwest of Wood Ranch.  Domengine Ranch is completely contiguous and borders Interstate 5 on the east.  Near its eastern edge, it has road access to the Coalinga-Mendota Road, which runs into Highway 198.

Defendants present the testimony of Arthur Gimmy and Richard Watson who value the Subject Properties based on their potential for development into a residential/golf course community.  Mr. Gimmy states that the highest and best use of Domengine Ranch "is to undertake a showcase ranch or resort/residential/golf community project" and the highest and best use of Wood Ranch "is to undertake a resort/residential/golf community project." Doc. 44, Part 5, Gimmy Report, at 47; Doc. 44, Part 9, Gimmy Report, at 49.  Mr. Watson states that the highest and best use of Domengine Ranch "is as a site for a golf course oriented residential

---

[1]This matter was five separate eminent domain actions all related to Path 15: 03-6065, 03-6067, 03-6068, 03-6076, and 03-6086.  The cases were consolidated on August 26, 2004.  Doc. 36.  All other persons with interests in the subject properties have disclaimed those interests and the Defendants share representation in this case.  These parties have interlocking financial relationships regarding these properties.  The Government has provided no argumentation as to whether the Defendants should be treated as legally separate entities in determining what the proper land units are for evaluation so Defendants will be legally treated as one.

1   community" and that the highest and best use of Wood Ranch "is a golf course residential

2   community built around a resort golf course and day spa." Doc. 44, Part 13, Watson Report, at 2;

3   Doc. 44, Part 16, Watson Report, at 3.  The Government seeks to "screen and exclude from

4   consideration the land use of residential subdivision." Doc. 78, Government's Brief, at 15:4-5.

5   On that basis, the Government objects to Mr. Gimmy's and Mr. Watson's testimonies.

6

7                              **II. Legal Standards**

8       "Just compensation for condemned property is measured generally by the fair and

9   reasonable market value of the property or interest taken." United States v. 429.59 Acres of Land,

10   612 F.2d 459, 462 (9th Cir. 1980).  Market value is defined as "what it fairly may be believed

11   that a purchaser in fair market conditions would have given" or "what a willing buyer would pay

12   in cash to a willing seller." New York v. Sage, 239 U.S. 57, 61(1915); United States v. Miller,

13   317 U.S. 369, 374 (1943).  "When the government takes only part of a person's property, and

14   when the value of the remainder depreciates because of the proposed use on the condemned

15   parcel, the owner is entitled to compensation both for that which is physically appropriated and

16   for the diminution in value to the non-condemned property." United States v. 33.5 Acres of Land,

17   789 F.2d 1396, 1398 (9th Cir. 1986).  Compensation for the diminution in value to the remainder

18   of a property is termed "severance damages." United States v. Miller, 317 U.S. 369, 376 (1943).

19       "The landowner does have the burden of establishing the value of the property subject to

20   condemnation. The landowner may prove the market value of the subject property by submitting

21   evidence of recent sales of similarly situated property. He may also seek to prove the market

22   value by submitting the testimony of expert witnesses who are qualified to appraise the value of

23   the subject property, and who have a factual basis for forming an opinion." United States v.

24   429.59 Acres of Land, 612 F.2d 459, 462 (9th Cir. 1980), citations omitted.  "The highest and

25   most profitable use for which the property is adaptable and needed or likely to be needed in the

26   reasonably near future is to be considered, not necessarily as the measure of value, but to the full

27   extent that the prospect of demand for such use affects the market value while the property is

28   privately held." Olson v. United States, 292 U.S. 246, 255 (1934).  "[A] property owner need not

1   be compensated for losing the ability to use his land when there is no 'reasonable probability'

2   that such a use will occur." <u>Wash. Legal Found. v. Legal Found. of Wash.</u>, 271 F.3d 835, 863

3   (9th Cir. 2001) (en banc), citing <u>United States ex rel. Tenn. Valley Auth. v. Powelson</u>, 319 U.S.

4   266, 275 (1943).  The U.S. Supreme Court upheld a trial court's decision to exclude evidence of

5   a potential use of property, saying "Elements affecting value that depend upon events or

6   combinations of occurrences which, while within the realm of possibility, are not fairly shown to

7   be reasonably probable, should be excluded from consideration, for that would be to allow mere

8   speculation and conjecture to become a guide for the ascertainment of value- a thing to be

9   condemned in business transactions as well as in judicial ascertainment of truth." <u>Olson v.</u>

10   <u>United States</u>, 292 U.S. 246, 257 (1934).

11      Though the plain language of <u>Olson</u> suggests that any factor which is not reasonably

12   probable should be excluded, courts have not applied it dogmatically.  In the open market, many

13   improbabilities are valuable and affect fair market value.  In one case, the area in which the taken

14   land sat had been developed for oil and gas for 14 years and nearly all the surrounding properties

15   had been leased out to oil companies. <u>Phillips v. United States</u>, 243 F.2d 1, 2 (9th Cir. 1957).

16   The Ninth Circuit found the trial court erred in instructing a jury to disregard evidence of

17   potential gas or oil extraction since "discovery in land of a reasonable probability of successful

18   development of gas or oil gives great value to such land and that it has a market value even

19   where the prospects of possible successful development are too speculative to be reasonably

20   probable." <u>Phillips v. United States</u>, 243 F.2d 1, 6 (9th Cir. 1957), citations omitted.  Even

21   though it was extremely unlikely the taken land would ultimately be developed into a successful

22   oil or gas field, the jury could still consider such evidence if the landowners could demonstrate a

23   reasonable probability that oil companies would attempt to explore the land for such a use.

24      Federal Rules of Civil Procedure 71A(h) states that "If the action involves the exercise of

25   the power of eminent domain under the law of the United States, any tribunal specially

26   constituted by an Act of Congress governing the case for the trial of the issue of just

27   compensation shall be the tribunal for the determination of that issue; but if there is no such

28   specially constituted tribunal any party may have a trial by jury of the issue of just

4

1  compensation....Trial of all issues shall otherwise be by the court." "[T]he sweeping language of

2  the final sentence of the Rule discloses a clear intent to give the district judge a role in

3  condemnation proceedings much broader than he occupies in a conventional jury trial. It is for

4  him to decide 'all issues' other than the precise issue of the amount of compensation to be

5  awarded." United States v. Reynolds, 397 U.S. 14, 20 (1970).  While highest and best use is a

6  question for the jury, the trial court must exercise a significant gatekeeping function.  The Eighth

7  Circuit, in discussing reasonable probability, provided the following formulation of a rule

8  governing the judge's duties in eminent domain cases:

9  First, the trial judge should screen the evidence concerning potential uses. Then, the trial
   judge should decide whether the landowner has produced credible evidence that a
10  potential use is reasonably practicable and reasonably probable within the near future. If
   credible evidence of the potential use is produced, the jury then decides whether the
11  property's suitability for this use enhances its market value, and, if so, by how much. The
   trial judge's screening of the evidence does not require an extensive and detailed review
12  of all the evidence. Rather, the judge need only find that there is credible evidence that
   the property is adaptable to the use and that there will be a need or demand for such use in
13  the near future.

14  United States v. 341.45 Acres of Land, 633 F.2d 108, 112 (8th Cir. 1980), citing United States v.

15  320.0 Acres of Land, 605 F.2d 762, 815-17 (5th Cir. 1979).  Ultimately, review for reasonable

16  probability must mean excluding evidence of valuation that would not be reasonably considered

17  by business interests and the broader marketplace in general.  That is, requiring the landowner to

18  provide some credible evidence that the land's open market value has been affected by the

19  prospect for some future use.  "[T]he fair market value for which an owner must be compensated

20  is an objectively transferable market value." United States v. Certain Land Situated in Detroit,

21  188 F. Supp. 2d 747, 760 (E.D. Mich. 2002), citing Kimball Laundry Co. v. United States, 338

22  U.S. 1, 5 (1949).  Review of reasonable probability with respect to adaptability for the specified

23  use and demand for the specified use are mere proxy factors for looking at the ultimate issue. See

24  United States v. 760.807 Acres of Land, 731 F.2d 1443, 1446 (9th Cir. 1984) ("effect on the

25  marketplace is the paramount concern in valuation").  After all, "the desired result is to see that

26  the landowner is put in as good a position pecuniarily as he would have occupied if his property

27  had not been taken." United States v. 100 Acres of Land, 468 F.2d 1261, 1265 (9th Cir. 1972).

28

# III. Discussion

## A. Demand for Residential Recreational Development

Defendants argue that demand for residential housing comes from a variety of sources. Mr. Gimmy discusses the effect of the Bay Area, Los Angeles, and growth in population of nearby cities. See Doc. 44, Part 8, Gimmy Report, at 41-44.  Mr. Watson discusses political driven "need for economic development" and the fact that "as property near the coast has become more expensive and less available for development, residential development has expanded inland to the Central Valley." Doc. 91, Part 4, Watson Declaration, at 10:15-19.  The general effect of new residents from the Bay Area (non-commuters), Los Angeles, and the coast are considered an element of the growth of nearby cities and not distinct sources of demand.  Mr. Gimmy has also referred to the proximity of Harris Ranch Inn as a factor to be considered. Doc. 91, Part 3, Gimmy Declaration, at 2:14-17.

## 1. Case Law on Potential Residential Subdivision Development

There are a number of older circuit cases that have dealt with the admissibility of evidence when the landowner asserts that the highest and best use of agricultural land is potential residential subdivision development.  Defendants have pointed to one Ninth Circuit opinion in which a trial court's admittance of landowners' experts' testimony was upheld. United States v. Waterhouse, 132 F.2d 699 (9th Cir. 1943).  In that case, "all valuation witnesses were agreed that the frontages were adaptable for purposes other than [sugar] cane-land. Even [the government's] witnesses recognized that fact. The dispute existed only as to the remainder of the lands. For [the landowner], there was testimony of a demand for the uses mentioned and of the reasons therefor. There was also evidence of the record of previous subdivisions in that vicinity. Under these circumstances, we think the question was properly submitted to the jury." United States v. Waterhouse, 132 F.2d 699, 703 (9th Cir. 1943).  The landowner presented detailed evidence of nearby subdivision:

> The lands [condemned] are within the limits of the City and County of Honolulu, about 9 miles west of the civic center of the city, and are referred to as lands belonging to the Damon Estate. About a mile and three-quarters closer to the city (east of the lands

involved here), and north of, but adjoining, Kamehameha Highway, the Damon Estate, in 1924, subdivided 9.5538 acres into 14 lots and leased them all within 6 months. At the time of trial, the net rental from them was $133.20 per acre. About a mile and a quarter east of the lands involved here, and south of Kamehameha Highway, the Damon Estate in 1929 subdivided 121.532 acres into about 100 lots, and leased 90% of them in two or three years. The net rentals from them was $42.26 per acre. About half a mile east of the lands involved here, and south of Kamehameha Highway, the Damon Estate in 1933 subdivided 178.695 acres into about 300 lots and leased 90% of them in a little over three years. The net rentals from them was $63.88. Adjoining this last-mentioned subdivision, on the west thereof, the Damon Estate in 1938 leased 9 acres to one Waterhouse, who subdivided the acreage. The rental therefor was $80 per acre.

United States v. Waterhouse, 132 F.2d 699, 700 (9th Cir. 1943).

In another opinion, the Ninth Circuit reviewed four eminent domain cases connected with a common public works project. United States v. Benning, 330 F.2d 527 (9th Cir. 1964). The fair market value of the taking was determined by commissions appointed under Fed. R. Civ. Proc 71A(h) in lieu of a jury trial.

In all of these cases the Commissioners have found the highest and best use of substantial portions of the lands to be for development and use as residential subdivisions and as rural or view or country-estate homesites. The Government's attack is principally leveled at this determination. We know from Commission findings in Battin that the valleys of Santa Ana and Coyote Creeks, in which the condemned parcels are located, were wholly rural with no existing residential subdivisions. The Government insists that under these circumstances the Commissions were compelled to accept the views of the Government witnesses to the effect that the highest and best use was agricultural with some possibility of country estates.

****

It was found in each case that many lands in Santa Ana and Coyote Valleys, and in immediately surrounding areas were in the transition stage from dry farming and more extensive agriculture to development for small rural estates and residential subdivisions. It was found in each case that properties in Ventura County and in the area of (the lands condemned) were at the time of the take greatly in demand, because, among other things, a large number of people of retired status were seeking country life on either residential subdivisions or country estates or rural ranges. In each case it was found that as of the date of the taking there were willing buyers in the open market for lands which were reasonably adaptable to all the uses which the evidence of both plaintiff and defendant showed that the lands in the subject property were reasonably adaptable and capable of being used as of said date.

United States v. Benning, 330 F.2d 527, 531-2 (9th Cir. 1964), quotations omitted. The government objected to those findings as being without evidentiary support but the Ninth Circuit upheld the commissions' findings, stating:

landowner witnesses did testify that there would have been an immediate market for subdivisions on V-R Ranch property; that there were buyers in the market that would have been interested in subdividing part of the Benning land immediately, and that it was

7

probable that the same immediate development could have taken place in the category of country estates. A tentative subdivision map for 250 acres of the V-R Ranch property had been filed and approved by the County Planning Commission a year before the take. Residential subdivision development in the direction of the town of Ojai (at a distance of six miles) had spread quite close to the Dunshee, Benning and Battin properties. While one witness respecting the Dunshee and Battin properties was less optimistic as to residential use in the immediate future, he did testify that it was quite likely that these properties at the time would have interested many, many buyers of subdivision property (known among subdividers and land developers as 'stock-pilers' or 'inventory buyers') who would not have plans for immediate development but would invest for future development. The principal Government expert himself testified that we are getting away from agricultural values and you have to recognize that there is a residential or rural use element coming into play influencing these values.

General evidence as to the region supports a determination that residential use in the not distant future was a reasonable probability. The proximity of Los Angeles County and the general population spill-out from the Los Angeles area, with resulting rapid population growth of Ventura County, demonstrate a potential market. The superior scenic and climatic attractions of these valleys and the nearby location of the town of Ojai, a recognized cultural center, render it wholly reasonable to conclude that had these properties been available to those seeking homesites the area would have been a preferred one.

United States v. Benning, 330 F.2d 527, 532 (9th Cir. 1964).  While the Ninth Circuit's analysis was not dealing with exclusion of evidence, the factors consulted appears to be similar.

Cases from Fifth and Sixth Circuits have also directly dealt with the admissibility of evidence when potential residential use is claimed for agricultural land.  In one Sixth Circuit case, the government condemned 193 acres of land bordering a state highway 4.1 miles outside of Campbellsville, Kentucky. United States v. 1291.83 Acres of Land, 411 F.2d 1081 (6th Cir. 1969).  The trial judge (acting as the fact finder in this case without a jury) "unequivocally refused to consider any testimony or evidence whatsoever which related to any valuation of the property except as a farm." United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1083 (6th Cir. 1969).  The Sixth Circuit found the trial court erred in excluding the landowner's proposed evidence and remanded for reconsideration due to the following facts:

In the years preceding the condemnation, Campbellsville had been growing rapidly due to an influx of industry. The population increase between 1950 and 1960 was more than 100%. The appellants [landowners] offered evidence to show that there had been a tremendous increase in the demand for housing, that most roads leading out of Campbellsville for a distance of five or six miles were 'lined' with homes built since 1961. The appellants offered evidence that there was one subdivision, containing 40 to 50 new homes, located eight miles from Campbellsville.

Appellant Raymond Faulkner testified that he had received several inquiries as to whether

he would be willing to sell parcels of his farm along the 1.4 miles of road frontage for residential building purposes. Faulkner testified that he had refused to sell the land on a piecemeal basis because he preferred to wait for an appropriate time to pursue the development of a comprehensive subdivision plan. The appellants offered in evidence a proposed subdivision plan, prepared by engineers, which would have required an expenditure of approximately $39,000 for additional roadways to permit development of the entire parcel of land. There was offered additional testimony that other property bordering on roads in the area of the Faulkner farm had been sold for homesite purposes at substantial prices.

United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1083 (6th Cir. 1969). Interestingly enough, the Sixth Circuit noted that a relaxed admission standard applied in bench trials and that there was a distinction between homesites on a pre-existing road and residential subdivisions in the case:

It appears to this Court, from the record made for purposes of this appeal, that any valuation of the appellants' [landowners'] property based upon a comprehensive subdivision would probably be highly speculative. Not only because such development would require expenditure of substantial sums of capital but also because there did not appear, from the record as made for appeal, a demand for such a subdivision in the area in question. In so stating, this Court does not express its approval of the trial court's unequivocal refusal to consider the evidence relating to such comprehensive subdivision. Unlike Berry [another case discussed in the opinion], the trial herein was conducted before the court without a jury. While it is settled law that the trial judge has considerable discretion as to what evidence should be admitted, the federal rules and practice favor admission of evidence rather than exclusion if the proffered evidence has any probative value. In particular, rules of admissibility should not be applied with the same strictness where the case is tried before the court without a jury.

If the trial court had considered the appellants' comprehensive subdivision and found it too speculative we could not, on the record before us, disagree with such a conclusion. From the evidence offered, in connection with the record made for appeal, it appears to this court that serious consideration should have been given to appellants' proffered evidence relating to the potential value of the Faulkner property, abutting on the roads, for sale as homesites. Such sales would not have required any expenditure of capital and the evidence as offered indicated a demand for such homesites.

United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1087 (6th Cir. 1969). While the Sixth Circuit was clear in stating that the evidence should not have been completely excluded, the language of the opinion is equivocal regarding the standard applied and whether a limited exclusion of the evidence allowing testimony as to homesite usage while disallowing subdivision usage would have been appropriate.

Defendants have cited to another Sixth Circuit case in which the court reversed a trial court's exclusion of evidence in a jury case. United States v. 478.34 Acres of Land, 578 F.2d

156, 157 (6th Cir. 1978).  Defendants claim the holding was that

> present demand was shown through evidence of population growth. The county planner testified as to the residential build-up from urban people coming into the community, and that with the expansion of metropolitan Louisville their county had begun to feel the pressures of population growth.  The real estate expert also testified to the population trends in the area which were resulting in large demand for small acreage residential tracts.  The appellate court held the evidence was sufficient to support a finding by the jury that the property is adaptable and needed or likely to be needed in the reasonably near future for home site development.

 Doc. 91, Defendants' Opposition, at 19:14-22.  The court's reading of the case shows a different emphasis in the holding.  The landowner valued the condemned property as "five or ten acre tracts for home sites" based on:

> the fact that he had recently sold a residential lot off of his other farm in the same community for $4,000 and on the additional fact that two other farmers in the neighborhood had each sold several lots off their farms for $4,000 an acre....The Spencer County Planning Coordinator testified as a witness for the landowner. He acknowledged that the county had steadily lost population since 1920 but stated that his research indicated 'changes were occurring' in this 'traditional oriented community of small farmers.' The 'two most significant' changes, according to the planner, 'were the return of...people's sons and daughters who had migrated to the city for jobs, coming back home to live in the country to participate in the local way of life while continuing to drive to the city for employment and...the residential build-up from urban people coming into the community, getting away from the city, coming out in the rural countryside to enjoy life in the small community.' He said that as a result of this 'pattern,' and as a result of the expansion of metropolitan Louisville, Spencer County had just 'begun to feel the pressures' of population growth.
>
> ****
>
> The real estate expert agreed with the county's planner that population trends in the area were changing and contended that there was a large demand for such small acreage tracts; during the past several years, he had received many telephone calls from potential purchasers for such tracts; and for several years he had been in the process of developing three farms into small acreage tracts, including his own farm. He testified that he knew of several other farms which were being similarly subdivided into small acreage tracts. The sales prices for such tracts ranged from less than $1,000 an acre to $4,000 an acre. Based on these sales, his estimate of the demand, and his opinion that the Cook farm could be successfully subdivided, he appraised the Cook's farm at $197,000.

United States v. 478.34 Acres of Land, 578 F.2d 156, 158-159 (6th Cir. 1978).  The condemned property was 30 miles outside of Louisville.  The Sixth Circuit's relevant holding is as follows:

> The district judge properly excluded evidence that the whole farm or a substantial portion of it could be subdivided in the near future. The landowner offered no credible evidence of any current demand or potential for subdivisions in the neighborhood of the Cook's farm, and there was no credible evidence concerning the costs of subdividing the property or evidence that the Cooks had a plan to subdivide it. But the landowner did show that

there was a growing demand for strip development along rural roads in the county. The Cooks had sold off one lot for this purpose themselves on another farm they owned nearby, and a number of farmers in the community were selling off lots for this purpose.

United States v. 478.34 Acres of Land, 578 F.2d 156, 159 (6th Cir. 1978).  Both demographics and the sales of land nearby for strip/home site development were key.  Defendants' contention that evidence of area growth alone was sufficient for the issue to go to a jury is rejected.

The Fifth Circuit upheld a trial judge's decision to limit the testimony presented to the jury when the proffered evidence of potential residential use was insufficient:

the landowner contended that the highest and best use of the land was small rural tracts held, for example, for recreational or residential purposes. Land cut in smaller tracts, he said, would bring a higher price than the land could command if devoted only and forever to its existing use, as part of the surrounding property, ranching. The government countered with evidence that the best use for the land was ranching and that the land was not suitable for the purposes the landowner urged on the court. Since the landowner's evidence was speculative and since no other evidence to disturb the presumption in favor of existing use was presented, we must agree with the government. There was testimony that access to the land was poor. More telling, however, is the failure to show the reasonable probability that the property, *at the time of the taking*, was adaptable and *needed, or likely to be needed in the near future*, for the potential use. While landowner's experts stated that in general there was a market for small tracts across the entire South Texas area, statements with which the government expert agreed, the sole proffered indicator of such a trend in the area south of Beeville was a single group of smaller tracts north of the land in question. However, sales of these tracts were few in number and not concentrated in time period. A good number of them did not take place until two to three years after the date of taking -- hardly an indication of demand for small tracts at the valuation date. Further, all witnesses agreed that there had been no subdivision in this area, other than the group of sporadically divided tracts mentioned above, even though all the property south of Beeville was susceptible to subdivision. The population growth in Beeville was nearly stagnant. Finally, and significantly, the property borders directly on Chase Air Field, close to the runway, where noise from takeoff and arrival of aircraft would be a constant nuisance. [footnote 6] Given this combination of facts, we cannot call it abuse of discretion to keep this testimony from the jury.

[footnote 6] The landowner's witnesses testified to developments close to airfields in other areas; however, there was no showing of similar population growth patterns or similar types of land in those locations.

United States v. 158.24 Acres of Land, 515 F.2d 230, 233 (5th Cir. 1975), emphasis in original. Though the distance between the property and the city was not specified in the opinion, Chase Air Field is approximately four to six miles southeast of Beeville.  The Fifth Circuit case is particularly notable as the appeals court upheld the exclusion of evidence even though the landowner provided expert opinions that the land was valuable as potential residential development.  When the basis of an expert's opinion as to the property's potential market use is

1    too structurally meager to be credible, evidence is properly excluded.

2         Review of these five cases as a whole reveals that the question of admissibility (regarding

3    demand for housing) is tightly tailored to the local conditions of the real estate market.  In

4    particular, all of these courts specifically examined whether development of the type asserted by

5    the landowner or sale of land for that purpose has taken place close to the condemned land.  In

6    four of the five cases (all except Waterhouse), the court also explicitly noted whether there was

7    population growth in the area.  The courts then often noted whether the condemned property was

8    within the current zone of development activity (which includes both building and purchases of

9    land at a premium over the price suggested by its current use due to the intent to eventually

10   develop into housing).  Inside that zone, which might be considered a rough circle around a town,

11   residential use can be considered, as in 1291.83 Acres. Where there was no population growth in

12   the area, valuation based on residential use for condemned lane outside that zone may be

13   excluded, as in the Fifth Circuit case.  Where there is population growth, lands outside but close

14   to the zone may be valued for residential purposes, as in Benning and arguably 478.34 Acres.

15   Presumably, the more growth, the farther outside the zone a property can be.  Though the circuit

16   court opinions do not explicitly state such a rule, it appears that this general framework would

17   explain their collective holdings.

18        Defendants have also cited to a non-residential housing case from the Fourth Circuit for

19   the proposition that "market demand can be demonstrated by a variety of factors, including

20   development trends and favorable government attitude, and is not dependent on the present

21   existence of the use in the general area of the property." Doc. 91, Defendants' Opposition, at

22   19:9-12.  While development trends are definitely relevant, the court does not find that

23   government attitude is an element of market demand in the case of residential development.  In

24   the cited case, the Fourth Circuit upheld the commissioners' judgment that just compensation for

25   riverfront land include a premium for its potential use as an industrial site though the government

26   stated "the land for 65 miles along the river is used for timber and farming purposes only."

27   United States v. Wateree Power Co., 220 F.2d 226, 228 (4th Cir. 1955).  The Fourth Circuit case

28   appears to take an extremely expansive view of relevant evidence:

In order to show that the land was suitable for industrial purposes, and that the industrial development of the state has progressed sufficiently to influence the market value of the taken land and the adjacent tract, the property owners offered witnesses well qualified to express an opinion as to what the property was worth for industrial purposes. These witnesses included a member of an engineering firm which specializes in site investigation for water-using industries, the president of one of the largest industrial construction corporations in the southeastern section of the United States, a member of a large real estate and investment corporation with broad experience in industrial site locations, and the director of the Research, Planning and Development Board of the State of South Carolina.

****

[the government] contends that the witnesses for the owners based their opinions on the general industrial development of the southeastern section of the country without showing that there was any actual demand for property for industrial purposes in the vicinity of the lands in question. This contention is not without substance, but its weight must be considered in the light of the testimony of the witnesses heard by the Commission which was based on long experience and great familiarity with the industrial conditions prevailing in the state. Mention was made in the testimony offered on behalf of the property owners of three or four large corporations who were contemplating the outlay of large sums of money in the erection of industrial plants on sites with available water, and the opinion was expressed that within the reasonable foreseeable future as of the time the lands were taken they might have been used, if available, for industrial purposes. More specifically the witnesses testified as to a substantial trend of large industries to locate in South Carolina, and referred to a celancese plant at Rock Hill and a Dupont plant at Florence, and they expressed the opinion that if the condemned land had not been taken it would have been considered by industries known to be in search of suitable sites. This testimony also tended to show that available sites with water supply equal to that accessible to the lands taken were limited in number, especially when comparable conditions of transportation, proximity to market, and size of acreage were taken into account.

United States v. Wateree Power Co., 220 F.2d 226, 229-231 (4th Cir. 1955). The Fourth Circuit considered the overall state of South Carolina as the appropriate general area for comparison. The evidence presented showed that there was an overall incipient market for industrial site use in the state. To the extent that the whole state was the proper relevant area to be examined, the fact that there was testimony concerning industries actively looking for suitable industrial sites at the time of the taking is significant. The landowner in fact pointed to specific industrial plants in South Carolina in operation. Large scale industrial use targeted at interstate commerce is not the same as residential use; the relevant area of examination is much broader for the former than the latter. A simple finding that housing demand is growing within California (or even the Central Valley) alone is insufficient to show credible demand for residential subdivision in any specific location.

**2. Evidence of Demand Based on Harris Ranch Inn**

Defendants point to the Subject Properties' proximity to the Harris Ranch Inn.  Though the exact connection between the Harris Ranch Inn and Defendant Harris Farms has not been stated, the court assumes that some corporate relationship exists.  Mr. Gimmy says "The Wood Ranch, because of its immediate proximity to the Harris Ranch Inn and the 198-I-5 Interchange, provides the next phase of development of the Harris Ranch Inn. Knowledgeable developers bank such land in the path of growth." Doc. 91, Part 3, Gimmy Declaration, at 2:14-17. However, Defendants have not argued that the highest and best use of the Subject Properties is an expansion of Harris Ranch Inn.  Instead, they claim that golf course-residential complexes are the highest and best use.

A landowner's specific plans for property taken by eminent domain may not be compensable unless it is shown to be market driven. See United States v. Easement & Right of Way 100 Feet Wide, 447 F.2d 1317, 1319 (6th Cir. 1971) ("while consideration must be given to the adaptability of the property in the future just compensation is not the value to the owner for his peculiar purpose, and it is generally accepted that there must be demonstrated an actual profitable use or a market demand for the prospective use").  Defendants must show more than that they themselves might have been willing to put in the effort to eventually build residential housing and golf courses on the Subject Properties.  As Defendants have said "Whether a change in use is reasonably probable is based on the market place judgment." Doc. 91, Part 1, Defendants' Opposition, at 18:16-17.  Mr. Gimmy states that "Highest and best use is based on what a third party would do with the property with full knowledge." Doc. 91, Part 3, Gimmy Declaration, at 2:3-4.  Defendants must present some credible evidence that others would have been willing to purchase those properties in 2003 at a premium over their value as cattle pastures with an eye towards potential future development.  That lost premium is what is compensable.

Defendants have not provided any evidence that the proximity of Harris Ranch Inn is a factor in determining demand for residential housing development.  A supplement to Gimmy's Rule 26 report for the Wood Ranch does note that guests at the Harris Ranch Inn often inquire about golf courses and spa services.  In addition, Harris Ranch Inn studied the feasibility of

1  building a golf course in 2004 but decided against going forward with the project. Doc. 58, Part

2  3, Ex. A, Gimmy Supplement, at 3.  While this does support Defendants' argument that there is

3  demand for a new golf course in the area, that demand can not be leveraged into demand for a

4  golf course/residential community.  Defendants' own expert on golf course/residential

5  community design admits that the focus of these projects rests on the residential use with the golf

6  course as an amenity.  In describing potential development on the Subject Properties, Mr. Knott

7  states, "Economics will necessitate the requirement for integrating residential communities with

8  the golf course to provide a comfortable mix of housing, golf, and open space" and  "Stand alone

9  golf courses are rarely economically feasible. Many golf courses are built solely for the purpose

10  of adding value to surrounding residential communities." Doc. 64, Knott Report, at 2 and 5.  Mr.

11  Watson has said, "I don't think, current times I don't see any courses, other than municipal

12  courses, that can survive if they're not integrated residential, golf and residential." Doc. 88, Part

13  3, Ex. M, Watson Deposition, at 161:20-22.  Given these statements, Defendants can not rely on

14  golf course demand to substantiate a reasonable probability of need for a golf course/residential

15  complex.  While the nearness of Harris Ranch Inn supports Defendants' contention that there is a

16  market for golf and spa services, it is insufficient to show residential housing demand.

17

18  **3. Evidence of Demand Based on Political Sources**

19       Mr. Watson discusses the fact that the October 2000 Fresno County General Plan

20  contains a provision directed at lands designated for non-agricultural rural development which

21  "provides that planned residential developments of at least 100 acres that, incorporate a golf

22  course or permanent water body(ies), where the minimum lot size is 36,000 square feet can be

23  approved by the Board of Supervisors....The plan seeks to promote job growth and reduce

24  unemployment through the enhancement and expansion of its traditional agricultural economic

25  base and through the diversification of its economic base, expanding such business clusters as

26  information technology, industrial machinery, and tourism." Doc. 91, Part 4, Watson Declaration,

27  at 6:27-7:10.  Defendants also provide the declarations of Fresno County Supervisors who

28  support the proposed projects on the Subject Properties. Doc. 91, Parts 6 and 7; Larson and

1   Waterston Declarations.  Official encouragement constitutes evidence that the Subject Properties

2   may be adaptable for that use (zoning, etc.) but is insufficient to show demand.

3

4   **4. Evidence of Demand Based on Commuters**

5       Regarding Bay Area commuters, Mr. Gimmy represents that "new development and

6   growth has continued southward along I-5 in and around cities such as Patterson, Santa Nella,

7   Los Banos, Dos Palos and Coalinga." Doc. 44, Part 8, Gimmy Report, at 41.  "In northern

8   California, this has created a large population of commuters who retain their jobs in Contra

9   Costa, Alameda, San Francisco, Santa Clara and other metropolitan locations and commute from

10  60 to over 100 miles per day." Doc. 44, Part 5, Gimmy Report, at 25.  To support the assertion

11  that this trend has reached the area around the Subject Properties, Mr. Gimmy refers to sales of

12  development land along the I-5 corridor in Merced County, near the intersection with Highway

13  152 (approximately 70 miles north of the Subject Properties).  The size of these parcels range

14  from 153 to 766 acres and the sale prices range from $13,000 to 20,000/acre.  The court is

15  familiar with these sales as they were analyzed as part of the related case United States v. 87.98

16  Acres, CV-03-6064.  While they constitute credible evidence that Bay Area commuters are

17  affecting the housing market near Los Banos and Santa Nella, they do not show that there has

18  been any effect in the southwest corner of Fresno County.  Sales 70 miles away can not be relied

19  on to show housing demand.  Further, Mr. Gimmy admits "there have been no purchases of

20  development land (i.e., land that would have a potential for a mixed-use/residential/ recreational,

21  etc.) along the I-5 corridor in Fresno County." Doc. 44, Part 9, Gimmy Report, at 57.  As a

22  practical matter, a commute from the developments near Highway 152 to the Bay Area is already

23  long.  Tacking on an extra sixty minutes may not be feasible.  On the prospect of travel to Silicon

24  Valley (the closest part of the Bay Area), Mr. Watson stated "What we're talking about down

25  here is really related to tourism development....I didn't even consider that on a regular

26  commuting basis." Doc. 88, Part 3, Ex. M, Watson Deposition, at 140:13-18.  The admitted lack

27  of any open market sales of property in the I-5 corridor in Fresno County (running tens of miles

28  long) that show any sign of a potential residential development premium belies Defendants'

1    claim that there is a reasonable probability or residential housing demand generated from the Bay

2    Area.  The proffered evidence concerning Bay Ara commuters is insufficient to show residential

3    housing demand.

4

5    **5. Evidence of Demand Based on Growth From Nearby Cities**

6           Defendants' experts discuss the growth of Coalinga, Hanford, Lemoore, Huron, and

7    Avenal.  However, Lemoore is approximately 30 miles to the east with Hanford a further 5 miles

8    out.[2]  Mr. Gimmy has presented evidence of "development land transactions" from these cities,

9    but none of them are near the Subject Properties. See Doc. 44, Part 6, Gimmy Report, at 55 and

10   58.  Four sales are clustered near Lemoore and Hanford and one is near Corcoran (south of those

11   cities).  This evidence does not suggest that residential development from those cities has

12   expanded in a wide radius or that development has reached out specifically in the direction of the

13   Subject Properties.  Huron and Avenal are small communities "with only moderate development

14   activity taking place." Doc. 44, Part 5, Gimmy Report, at 17-19.  Defendants provided no land

15   sales in relation to those cities.  Mr. Gimmy also refers to the City of Fresno as "a commuting

16   distance for the employees at Harris Ranch." Doc. 91, Part 3, Gimmy Declaration, at 2:20-21.

17   Aside from that, Defendants do not appear to make any argument to demand for housing due to

18   individuals who would commute to Fresno.  The focus must be on housing development

19   emanating from Coalinga.

20          In 1990, the population of Coalinga was 8,212. Doc. 43, Part 2, Correia Report, at 13.  In

21   2000, the U.S. Census reported 11,668 people.  As of 2004, Coalinga had a population of 16,684.

22   ────────────────

23          [2]Mr. Gimmy makes inconsistent statements regarding Lemoore's and Hanford's distance.
     At one point he says Hanford is "along Highway 198 about 40 miles east of I-5" with Lemoore
24   less than ten miles west. Doc. 44, Part 5, Gimmy Report, at 17.  Later, he claims "Lemoore is
     about 20-miles east of the subject site via Route 198" and "Hanford is about 30-miles east of the
25   subject on Route 198." Doc. 44, Part 5, Gimmy Report, at 42-3.  At yet another point, Mr.
     Gimmy says Lemoore is "located about 35-miles east of the subject on Route 198." Doc. 44, part
26   5, at 28.  Mr. Watson states that From Domengine Ranch, Lemoore is 33.5 miles away and
     Hanford is 39.6 miles away.  The court estimates the distance from the Subject Properties to
27   Lemoore and Hanford are 30 and 35 miles respectively.

28

1   Doc. 44, Part 5, Gimmy Report, at 13.  Presumably, these numbers include approximately 5,000

2   prisoners incarcerated in the Pleasant Valley State Prison which opened in 1994.  Of note is the

3   recent construction of Coalinga State Hospital.  Started in 2001 and completed in 2005, it was

4   projected to create 2,000 additional jobs and a need for 1,245 housing units. Doc. 44, Part 5,

5   Gimmy Report, at 15.  Mr. Gimmy says that Coalinga is expected to double in size over the next

6   20 years. Doc. 44, Part 5, Gimmy Report, at 15.  Overall though, Mr. Watson states that "the

7   County's [Fresno's] unemployment rate has been among the highest in California and average

8   wage levels have been low." Doc. 44, Part 13, Watson Report, at 11.  Mr. Gimmy states that

9   unemployment as of 2002 was 12.2% in Coalinga.  Housing stock totaled 3,806 housing units in

10  2004. Doc. 44, Part 5, Gimmy Report, at 13.  Mr. Gimmy states "Over 4,100 residential units in

11  more than a dozen projects are currently planned for development in Coalinga. These projects

12  vary in stage of development, from conceptual review to currently under construction.

13  Completion of all of these units would result in a more than 100% increase" in housing stock.

14  Doc. 58, Part 2, Gimmy Supplement, at 3.  From this thicket of statistics, it can be inferred that

15  there is significant growth in the Coalinga area.

16          The Subject Properties are approximately 10-12 miles northeast of Coalinga.  There is

17  some uncertainty over the precise location of the Subject Properties relative to that city.  In his

18  report on the Domengine Ranch, Mr. Gimmy says "the subject properties have a Coalinga post

19  office address and are less than 10 miles from the City limits." Doc. 44, Part 5, Gimmy Report, at

20  13.  Mr. Gimmy has also stated that relative to the Wood Ranch, "the nearest grocery store is in

21  Coalinga (about 12 miles away)." Doc. 91, Part 3, Gimmy Declaration, at 2:21-22.  Mr. Watson

22  says that Domengine Ranch is 11.7 miles from Coalinga. Doc. 44, Part 13, Watson Report, at 7.

23  Paradoxically, the Government's expert, Mr. Correia, erroneously describes Wood Ranch as

24  being "approximately (2) miles northeast and east of Coalinga." Doc. 43, Part 4, Correia Report,

25  at 18.  The 10 to 12 mile range seems to be appropriate.  Wood Ranch is part of the area covered

26  by the Coalinga Regional Plan component of the Fresno County General Plan, but the bulk of

27  Domengine Ranch is outside of that area. Doc. 88, Part 3, Ex. M., Watson Deposition, at 165:25-

28  166:19.

In his report, Mr. Gimmy referred to two sales of development land that appear to be within Coalinga city limits. Doc. 44, Part 9, Gimmy Report, at 57, 60, and 61. These were sales of 15 and 20 acre parcels. Mr. Gimmy did claim in his initial report that "Numerous other land purchases, especially around Coalinga, are under contract, pending annexation and possibly other considerations, involving parcels as large as over 300 acres for the same unit prices as indicated above [$19,217-$27,000/acre] up to $30,000." Doc. 44, Part 9, Gimmy Report, at 57. In his supplemental report, Mr. Gimmy provided evidence of two recent sales and one other parcel that has been advertised for sale. Of the two sales, one is within city limits and "the other a short distance from Coalinga. These transactions are within 10 miles of Wood Ranch, one purchased to construct housing around a 9-hole golf course and the other to develop a planned residential community." Doc. 91, Part 1, Defendants' Opposition, at 27:8-11. The two sales were for parcels of 77 acres and 206 acres respectively. Doc. 58, Part 3, Ex. A, Gimmy, Supplement, at 2 and 3. The other advertised property is described as "Approximately 820 acres of open/ranch land, ideal for eventual development....located on both sides of Hwy 198 between Interstate 5 and the City of Coalinga. 3 miles N of City of Coalinga." Doc. 58, Part 6, Ex. D, Gimmy Supplement, at 1. The evidence also notes that another residential development is planned (not yet built) directly south of this parcel for sale. There has been no evidence presented that there has been any other development activity closer to the Subject Properties. As of 2006, potential development around Coalinga has apparently reached three miles outside of the city on Highway 198. That is the boundary of the zone of development activity three years after the taking. The Subject Properties are seven to nine miles away.

Defendants have presented evidence that there is growth in Coalinga, that the type of development (housing subdivision around a golf course) is being pursued in the area at another site, and that the Subject Properties are seven to nine miles away from the zone of development activity in 2006. The size of the proposed developments on the Subject Properties are greater than the consummated sales of other development property around Coalinga but are of the same scale as the recently advertised property. The circuit court cases surveyed above generally dealt with properties that were closer to the zone of development activity. In Waterhouse, there was

1   development half a mile away.  In Benning, Ojai was only six miles away and there was

2   development from that city which "had spread quite close" to the properties. United States v.

3   Benning, 330 F.2d 527, 532 (9th Cir. 1964).  The Sixth Circuit in 478.34 Acres affirmed a

4   decision to allow evidence of homesite use and to exclude evidence of subdivision use as there

5   were sales for homesites but no sales for subdivision purposes nearby.  The city of Louisville,

6   where presumably there was residential subdivision activity, was 30 miles away.  The distance in

7   this case falls in between these precedents.  Given the fact that there is significant growth in the

8   Coalinga area, consideration of property seven to nine miles outside the zone is not wholly

9   unreasonable (though it may well be at the very outer edge of what is allowed).  The court can

10  not as a matter of law determine that there is insufficient credible evidence of market demand

11  such that the issue should not go to a jury.  Defendant is therefore free to present all its theories

12  regarding residential demand to the jury, including ones the court has not relied on in holding

13  that Defendant has come forward with credible evidence of such demand.

14

15  **B. Adaptability for Residential Recreational Development**

16  **1. Change in Zoning**

17      The Government asserts the development of the Subject Properties are precluded by

18  zoning and general planning restrictions.  They are currently zoned for agricultural use with

19  minimum parcel sizes of 20 or 40 acres. Doc. 79, Part 6, Ex. 5, Gimmy Deposition, at 31:11-19

20  and 48:19-24.  In determining if a property is adaptable for a proposed highest and best use, the

21  court decides whether such use was legally permissible at the time of the taking.  When a party

22  presents credible evidence that the legal restrictions attaching to the property may be changed,

23  the question goes to the jury. See United States v. 341.45 Acres of Land, 633 F.2d 108, 112 (8th

24  Cir. 1980), citing United States v. 320.0 Acres of Land, 605 F.2d 762, 815-7 (5th Cir. 1979).

25      The October 2000 Fresno County General Plan states that properties designated Westside

26  Rangeland (which the Subject Properties are) requires that they be used "for grazing and other

27  appropriate open space uses" and that "The County shall maintain forty (40) acres as the

28  minimum permitted parcel size." Doc. 79, Part 5, Ex. 2, General Plan, at 2-18 and 2-19.  The

1   Government states that "there is no reasonable probability of amending the General Plan in view

2   of the unequivocal directives to the contrary." Doc. 78, Government's Brief, at 19:16-17.  In

3   response, Defendants have presented the declarations of two of the five Fresno County

4   Supervisors.  Phil Larson stated, "I would be supportive of the projects described to me as I

5   believe they would help improve the economic condition of western Fresno County....For all

6   development applications, the Board of Supervisors considers staff and Planning Commission's

7   recommendation as well as the applicant's position and the public's input in deciding on whether

8   to approve or deny a project." Doc. 91, Part 6, Larson Declaration, at 2:10-11 and 3:4-7.

9   Similarly, Bob Waterston stated, "I would support this type of development on these properties

10  which would help to promote tourism with the golf courses and spa and would not displace any

11  prime agricultural land." Doc. 91, Part 7, Waterston Declaration, at 2:19-21.  While the General

12  Plan is clear, it is a policy statement without independent legal force: "This General Plan sets out

13  a vision reflected in goals, policies, programs, and diagrams for Fresno County for the period

14  2000 to 2020 and beyond." Doc. 79, Part 5, Ex. 2, General Plan, at 8.  Defendants have presented

15  sufficient evidence to show that the necessary zoning changes and development approvals might

16  be acquired.

17       The Government does not raise the lack of water to support development as a basis for

18  excluding the Defendants' proffered highest and best use.  Instead, the Government considers the

19  issue as incident to the probability of obtaining zoning changes necessary to complete the project.

20  Doc. 78, Government's Brief, at13:18-19; Doc. 101, Part 1, Government's Reply, at 19:5.

21

22  **2. Williamson Act**

23       The Wlliamson Act (Cal. Gov't Code §51200 et seq) seeks to protect agricultural land

24  from development.  The Act allows landowners to sign a contract with the state which restricts

25  development on a property for ten years in return for a guarantee that the property will be taxed

26  for use as open space.  The contract is automatically extended each year unless a notice of non-

27  renewal is submitted.  That is, once such notice is given, the development restrictions lapse in

28  approximately 10 years.  Domengine Ranch is under such contract and no notice of non-renewal

1   has been given.  Wood Ranch is not under a Williamson Act contract.

2   Cal. Gov't Code §51295 states that when a property under Williamson Act contract is

3   taken by eminent domain, the restrictions of that contract should not be considered in valuing

4   damages.  The Government cites to a Northern District case which states "Federal law, however,

5   requires the jury to consider the reasonably probable impact of land use restrictions such as the

6   Williamson Act on the highest and best potential use of the land," specifically rejecting a

7   landowner's argument that Cal. Gov't Code §51295 should apply. United States v. 95.14 Acres

8   of Land, 1989 U.S. Dist. LEXIS 12515, *7 (N.D. Cal. 1989).  Defendants argue against that

9   holding, claiming "the protection is built into the contract by operation of state law, which is

10  between a property owner and subdivision of the State - a county or city. The United States is not

11  a party to that contract. Where the State establishes the restriction of agricultural preservation

12  over property under such contract, the State can determine that the restriction can be forgiven

13  under whatever circumstance it choose." Doc. 91, Part 1, Defendants' Opposition, at 24:25-25:2.

14  Under federal law, an event that would not have occurred but for the taking itself should not be

15  considered in calculating damages; the goal is to place the landowner in the ex ante position.

16  "The court must exclude any depreciation in value caused by the prospective taking once the

17  Government 'was committed' to the project." United States v. Virginia Electric & Power Co.,

18  365 U.S. 624, 636 (1961), citing United States v. Miller, 317 U.S. 369, 376-7 (1943).

19  Conversely, the fact that the taking causes an increase in value must also be excluded.  The

20  cessation of Williamson Act restrictions can only be considered if it took place prior to a firm

21  commitment on the part of the Government to take Domengine Ranch.  California law may

22  specify otherwise when the state condemns land, but the federal standard is clear.

23  Defendants state that "the highest and best use [of Domengine Ranch] is to hold for 15-20

24  years for development." Doc. 91, Part 1, Defendants' Opposition, at 24:14-15.  Defendants'

25  valuation of that land is based on this assumption.  The Williamson Act contract, whose duties

26  cease approximately 10 years after notice of non-renewal, does not act to preclude potential

27  development.  The fact that Domengine Ranch is currently burdened by these restrictions will be

28  another factor for the jury to consider.

1

2   **3. Physical Boundaries of Wood Ranch**

3         The area in which Wood Ranch is situated is subject to a 3:1 mitigation ratio.  That is, for

4   every acre developed, three have to be kept as open space.  As a result, only 612 of the 2,448

5   acres of Wood Ranch are available for building with development set back away from Interstate

6   5. Doc. 44, Part 9, Gimmy Report, at 52.  Mr. Gimmy values the 612 acres on which building

7   would take place at $10,000/acre and the 1,836 acre balance at $667/acre.  The Government has

8   argued that Defendants could build on 612 acres of Wood Ranch that are not adjacent to Path 15.

9   In response, Defendants have said that any such development would be inferior to the plan as

10  presented.

11        Defendants have said that the 2,448 acres are contiguous, but from the map, it appears as

12  three segments that only touch briefly at corners, catty-corner to each other.  Broadly, Wood

13  Ranch is an incomplete ring, with a hollow center.  Parcel 065-050-02 ("Center Parcel") is part

14  of that center hollow, over which Path 15 runs.  A map of the development plan shows the golf

15  course/residential complex snaking through and over the Center Parcel. See Doc. 44, Part 16,

16  Att. 5, Wood Ranch Map.  In reference to the Center Parcel, Mr. Gimmy specifically states:

17        The U.S.A. owns a 100.96-acre inholding in Section 18 (APN 065-050-02). According to
          Dan Byrne, Realty Specialist for the U.S. Bureau of Land Management, Hollister Field
18        Office, this parcel is included in the Bureau's updated Resource Management Project on a
          list of BLM-owned properties considered for disposal. It is assumed that an acquisition or
19        land swap involving this parcel can be accomplished at some future date to develop the
          Wood [Ranch] in a cohesive and efficient manner.
20

21  Doc. 44, Part 8, Gimmy Report, at 21.  Significantly, Mr. Gimmy assumed that the Center Parcel

22  would form part of the 612 acres on which actual building would occur.  From the proposed map,

23  it appears that the Center Parcel is at the geographic heart of the development.

24        The U.S. Supreme Court has found "The fact that the most profitable use of a parcel can

25  be made only in combination with other lands does not necessarily exclude that use from

26  consideration if the possibility of combination is reasonably sufficient to affect market value."

27  Olson v. United States, 292 U.S. 246, 256 (1934).  In stating that a landowner can not rely on the

28  prospect of assembling additional parcels though eminent domain to boost the value of the

1   property taken, the U.S. Supreme Court found:

2   > An owner of lands sought to be condemned is entitled to their market value fairly
3   > determined. That value may reflect not only the use to which the property is presently
    > devoted but also that use to which it may be readily converted. In that connection the
4   > value may be determined in light of the special or higher use of the land when combined
    > with other parcels; it need not be measured merely by the use to which the land is or can
5   > be put as a separate tract. But in order for that special adaptability to be considered, *there*
    > *must be a reasonable probability of the lands in question being combined with other*
6   > *tracts for that purpose in the reasonably near future*. In absence of such a showing, the
    > chance of their being united for that special use is regarded as too remote and speculative
7   > to have any legitimate effect upon the valuation.

8   United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 275-76 (1943),

9   citations omitted, emphasis added.  "This 'reasonable probability' of unitization or use of parcels

10  in combination is a question of fact to be presented to the jury or the trier of fact." United States

11  v. 3276.21 Acres of Land, 194 F. Supp. 297, 302 (S.D. Cal. 1961).  However, the case to which it

12  cited for this proposition states, "In determining the question of law as to whether a sufficient

13  showing is made of the 'reasonable probability,' the court will want to hear facts and not some

14  expert's ultimate opinion about the very problem the court is to decide. An expert, of course, may

15  be used to present factual matters. Nor are we stating that expert testimony may not be offered on

16  technical problems such as the adequacy of a sewer line. What we are stating is that we will not

17  hear experts give their opinion that there is or is not the required 'reasonable probability.'"

18  United States v. 70.39 Acres of Land, 164 F. Supp. 451, 476 (S.D. Cal. 1958).  The court must

19  exercise a gatekeeping function and examine the underlying facts used to support the reasonable

20  probability.  Even when a landowner can show reasonable probability of unitization, severance

21  damages can only be based upon properties the landowner owned at the time of the taking.

22  "Where part of a tract in fee ownership is condemned, the loss in market value of the remainder

23  cannot be augmented by consideration of the damage caused thereto by the taking or prospective

24  use of lands held by third parties in fee simple as part of the same project. Nor can the fact that an

25  enterprise upon one parcel depends upon other lands in fee ownership of third parties for supply

26  of an essential material be used to connect the two for purposes of compensation." United States

27  v. Honolulu Plantation Co., 182 F.2d 172, 179 (9th Cir. 1950).  This holding was reiterated in

28  United States v. 87.30 Acres of Land, 430 F.2d 1130, 1133 (9th Cir. 1970).

Defendants recognize that their damages for Wood Ranch are limited to the boundaries of that property and can not include damages for the Center Parcel.  At oral argument on November 27, 2006, Defendants' counsel represented to the court that "The appraiser Gimmy does not put any value for his appraisal purposes on the white parcel [Center Parcel]."  Doc. 113, Trascript, at 92:15-17.  While the court is not clear as to how Mr. Gimmy's valuation excluded the 100 acres of the Center Parcel from the 612 acres of actual building, the Government has made no objection to Mr. Gimmy's testimony on this basis.

On the broader question of whether there is a reasonable probability of assemblage in the near future, there is no evidence aside from the passage in the Gimmy Report.  The language is equivocal.  Being on a list of properties "considered for disposal" says very little about the likelihood of actual disposal.  Defendants have not explained why the Center Parcel was put on such a list.  If the Government's reason for considering the disposal of the Center Parcel is related to Path 15 itself, then the possibility of disposal can not be considered as a matter of law.  See United States v. 100 Acres of Land, 468 F.2d 1261, 1268 (9th Cir. 1972) ("The argument of the [federal] Government on this question seems to be based on what [California's] policy was subsequent to the initiation of the Government's project, while the evidence was introduced to show probabilities that may have been prior thereto. It is fundamental that the effects of a project, which requires the taking of property, must be disregarded in determining the fair market value of the property prior to the taking").  At the hearing, Defendants' counsel stated that "BLM has already indicated a willingness to transfer it [Center Parcel], subject to a price, to the Wood Ranch."  Doc. 113, Trascript, at 92:20-22.  Again, the Government has made no objection on this issue.

### IV. Order

The Government's motion to exclude Defendants' proposed use of residential recreational development is DENIED.

IT IS SO ORDERED.

Dated:     December 18, 2006                          /s/ Anthony W. Ishii
0m8i78                                          UNITED STATES DISTRICT JUDGE